IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO.

**KELLY MUSICK**

     Plaintiff,

v.

**CHIEF DEPUTY DISTRICT ATTORNEY
JOHN PICKERING,
SERGEANT GENE McCAUSEY,
ATTORNEY GENERAL'S OFFICE
FOR THE STATE OF COLORADO,
DISTRICT ATTORNEY'S OFFICE
FOR THE 20TH JUDICIAL DISTRICT, and
LAFAYETTE POLICE DEPARTMENT,**

     Defendants.

---

## COMPLAINT

     Plaintiff Kelly Musick, by counsel, Mark Cameron Johnson, for her complaint states as follows:

### A. JURISDICTION

     1.    The Court has jurisdiction over the plaintiff's claims of violation of federal constitutional rights under 28 U.S.C. Sections 1331and 1343. The Court has supplemental jurisdiction over the state claims of quantum meruit pursuant to 28 U.S.C. Section 1367(a). The plaintiff bases

her federal claim upon the Constitution of the United States, particularly the 4th, 5th, 6th and 14th amendments, and 42 U.S.C. Section 1983. Venue is placed in this district because it is where all the parties reside and where the events complained of occurred.

## B. PARTIES

2.      Plaintiff, Kelly Musick, at all times relevant to this complaint, was employed by the 20th Judicial District of the State of Colorado as a court interpreter, interpreting the English language into Spanish for Spanish speaking defendants and witnesses who appeared in the courts of the 20th Judicial District.

3.      Defendant John Pickering was the Chief Deputy District Attorney for the District Attorney's Office representing the 20th Judicial District.

4.      Defendant Sergeant Gene McCausey was employed as a police officer by the City of Lafayette, State of Colorado.

5.      Defendant Attorney General's Office for the State of Colorado was the chief legal department for the State of Colorado.

6.      Defendant District Attorney's Office for the 20th Judicial District was the chief prosecutorial entity for the County of Boulder, State of Colorado with jurisdiction over both misdemeanor and felony prosecutions.

7.     Defendant Lafayette Police Department enforced criminal statutes within the city limits of the City of Lafayette, Colorado.

## C. FACTS

8.     The facts supporting Ms. Musick's claim are as follows. In 2004, Plaintiff Kelly Musick was employed as an interpreter with the 20th Judicial District in Boulder, Colorado. On or about May 10, 2004, Ms. Musick was approached by her direct supervisor, Miguel Bush. Mr. Bush informed Ms. Musick that he had a translation project that he did not have time to complete. This project was not connected to Ms. Musick's employment as a state of Colorado employee assigned to the 20th Judicial District. Mr. Bush offered part of the project to Ms. Musick. Mr. Bush also explained that a portion of the project would also be completed by Ms. Vicki Santamaria, a colleague of Ms. Musick who also was employed by the 20th Judicial District. Mr. Bush also told Ms. Musick that she would be paid $2000 for her portion of the project and that the translation had to be completed by the end of May, 2004. Mr. Bush stressed that the deadline was firm and the project entailed the translation from English to Spanish of 100 pages to narrative text contained in a police case file.

9.      Mr. Bush showed Ms. Musick samples of the pages that would have to be translated. Ms. Musick then told Mr. Bush that she would undertake the project. The police file dealt with an investigation of one Ramon Villalobos for a criminal charge of First Degree Murder arising out of an incident in Boulder, County. The Lafayette Police Department was the investigative body and the case was being prosecuted by the District Attorney's Office for the 20th Judicial District. It was later learned that the translation was done in order to seek the prosecution of Defendant Villalobos in Mexico pursuant to Article 4 of the Mexican Federal Penal Code. The Colorado Attorney General's Office worked directly with the Lafayette Police Department and the Boulder District Attorney's Office to arrange for the transfer of a translated copy of the original police reports to Mexico to secure a conviction in the case that arose in Lafayette, Colorado. This was done through a specific program administered by the Colorado State Attorney General's Office.

10.      Ms. Musick began the translation. After approximately a week, Ms. Musick realized that the project would require more time than originally set out by Mr. Buch. Mr. Buch had informed Ms. Musick that every document in the approximately 100 page police case file had to be recreated exactly in the format as the original. The case file contained a number of

documents that were on letter head from other investigative agencies.

Additionally, there were unique documents such as a driver's license and

photographs that required special formatting in order to do an exact

replication.

11.   Ms. Musick realized that additional time would be required to

complete the translation given that there were a number of documents that

required customized recreation. It became clear that the project was far more

complex than initially represented by Mr. Buch. Ms. Musick consulted with

Ms. Vicki Santamaria regarding the problems posed by the original text and

then met with Miguel Buch. Ms. Musick presented Mr. Buch with a list of

custom materials that would be required to recreate the unique documents.

That list was submitted to Mr. Buch on or about May 20, 2004. Mr. Buch

advised Ms. Musick and Ms. Santamaria that they should continue working

on the project while he made arrangements to secure the letter head

documents and forms that Ms. Musick requested.

12.   Mr. Buch suggested that Ms. Musick turn in the translation that

had been completed, including finished translations that lacked the proper

formatting. Mr. Buch stated that the formatting would be done later per the

orders of the project manager at the Colorado Attorney General's Office.

This person was later identified as Ms. LuzMaria Schearer, employee of the

Colorado Attorney General's Office. Both Ms. Musick and Ms. Santamaria posed a number of questions to Mr. Buch as they worked on the project. Those questions dealt with how to format unique documents and issues of vocabulary. Mr. Buch was unable to answer those questions. He said he was working with a "project manager" and he would submit these questions to her. Several weeks went by and Mr. Buch still had no answers to these questions. However, Mr. Bush simply urged Ms. Musick to continue working and assured her that he would provide the guidance and formatting materials she had requested.

13.     On several occasions, Ms. Musick requested that Mr. Buch put her in direct contact with the project director, but Mr. Buch refused. Mr. Buch went on vacation on June 4, 2004, and Ms. Musick and Ms. Santamaria were left with no one with whom they could communicate regarding the project. Ms. Musick discovered on or about June 10, 2004 that in late May, 2004, Ms. Santamaria attended a national conference for judicial translators and interpreters where, by chance, she met Ms. LuzMaria Shearer. In conversation, the two women discovered that they were both working on the Ramon Villalobos project. Ms. Shearer was surprised to hear that Miguel Buch was working on the project with someone else.

14.    A draft of the translation was turned in on June 27, 2004. The draft was faxed to Ms. Shearer by Ms. Musick. Mr. Buch emphasized to Ms. Musick at that time that Ms. Shearer had insisted that the draft be faxed and not be submitted electronically. Ms. Musick waited for over a month and heard nothing regarding when she would be paid for the translation. Ms. Musick went to Mr. Buch and asked him what plans were in place for Ms. Musick to be paid. Ms. Musick demanded that Mr. Buch put their agreement regarding payment in writing. Mr. Buch simply assured Ms. Musick that she would be paid. In the following weeks Ms. Musick continued to inquire of Mr. Buch regarding payment. Mr. Buch insisted that he had the money arranged for Ms. Musick and Ms. Santamaria and that the Lafayette Police Department had all of Mr. Buch's information in order to pay for the project.

15.    By the first of August, 2004, Mr. Musick still had no information regarding how she would be paid. Ms. Musick pushed Mr. Buch for a meeting with the project coordinator. Ms. Musick also received from Mr. Buch the name and telephone number of the person at the Lafayette Police Department who was responsible for the project. On August 4, 2004, Ms. Musick attended a meeting with Ms. Shearer from the Attorney General's Office. This was the first time that Ms. Musick had ever met Ms. Shearer. This meeting took place at the 20th Judicial Building in Boulder,

CO. Ms. Santamaria also attended. Mr. Buch did not attend. During that meeting, Ms. Shearer expressed her surprise and alarm that Mr. Buch had been contracting with Ms. Musick and Ms. Santamaria and had done none of the translation himself. Ms. Musick and Ms. Santamaria stated that there had been a number of difficulties in completing the project because Ms. Shearer had not communicated directly with them.

16.     During the meeting, it became evident that Mr. Buch had not passed on key information from Ms. Shearer to Ms. Musick and Ms. Santamaria. According to Ms. Schearer, Mr. Buch did not follow up with her regarding Ms. Musick's request for materials to do the custom document translation. This resulted in delay of the project. During the meeting, Ms. Shearer requested a number of "corrections" to the submitted translations. She had penciled in the requested "corrections" on the faxed documents submitted by Ms. Musick and Ms. Santamaria. Several of these corrections dealt with formatting issues and previously unspecified preferences in style. Ms. Shearer also requested that the translation be altered to eliminate phrases such as "First Degree Murder". Ms. Musick refused to make those changes, stating that it would be unethical to manipulate the translation in that manner. Ms. Shearer also brought with her approximately 25 pages of additional text that she wanted translated. Ms. Shearer stated that she wanted

the new translations and changes to be put in an electronic form and not be faxed. Ms. Shearer insisted that she had not wanted the previous translations faxed. Ms. Shearer provided Ms. Musick and Ms. Santamaria with some of the necessary materials to do the custom formatting and clarified the techniques and changes required to complete the project. It was agreed that the project would be completed by August 15, 2004.

17.     Ms. Musick raised the issue of payment with Ms. Shearer. Ms. Shearer stated that she was surprised when she saw the low bid from Mr. Buch. She told Buch when he submitted his bid that, in the past, bids for projects similar to this one were normally at $8,000.00 [eight thousand dollars]. Buch had assured Ms. Shearer that he could complete the project for $4,000.00. In response to Ms. Musick's questions regarding payment, Ms. Shearer suggested that Ms. Musick and Ms. Santamaria contact Sgt. McCausey at the Lafayette Police Department to discuss getting additional funds. Ms. Shearer assured both Ms. Musick and Ms. Santamaria that they would be paid for their work.

18.     On August 12, 2004, Ms. Musick called Sgt. Gene McCausey of the Lafayette Police Department. Ms. Musick informed Sgt. McCausey that Mr. Buch had not done the work, but that the translations had been done by herself and Ms. Santamaria and that additional work had been required.

Ms. Musick inquired about establishing a new contract with Sgt. McCausey

for the project that would fairly reflect the amount of work done and by

whom. Sgt. McCausey refused to speak with Ms. Musick about payment.

Sgt. McCausey stated that he had been "dealing" with Mr. Buch. Ms.

Musick asked Sgt. McCausey if there was a written contract between

himself and Mr. Buch. Sgt. McCausey refused to continue the conversation.

19.     On August 12, 2004, after the conversation with Sgt.

McCausey, Ms. Musick again approached Mr. Buch regarding payment. Ms.

Musick told Mr. Buch that it was obvious that the project had been grossly

under bid, particularly considering that the Attorney General's

representative, Ms. Shearer, was requesting additional pages of translation.

Ms. Musick demanded that Mr. Buch put terms for payment in writing.

Again, Mr. Buch assured Ms. Musick that she would be paid. Mr. Buch also

told Ms. Musick that she had severely angered Sgt. McCausey and that he,

McCausey, might not pay anything at this point because of Ms. Musick's

provocative phone call. Mr. Buch specifically told Ms. Musick not to call

Sgt. McCausey again, stating that Ms. Musick never should have called the

sergeant in the first place.

20.     On August 23, 2004, Ms. Musick invoiced Mr. Buch and the

Lafayette Police Department $13,214.00 for her work on the project. At that

point, Ms. Musick's actual bill was $16,020.00 but she reduced her bill to

$13,214.00 in hopes that she might be paid something. Ms. Musick

perceived that if the parties wouldn't even pay her the initial agreed price of

$2000.00, it was clear to her that she would never be paid what she actually

had into the project. Mr. Buch was very angry when he was given the

invoice by Ms. Musick. He stated that he didn't have that kind of money.

Several hours later, Mr. Buch showed Ms. Musick a memo that he stated he

would submit to the Lafayette Police Department. That memo requested

payment of $8,000.00 to be split between Ms. Musick and Ms. Santamaria.

There was no date certain requested for payment of the $8,000.00. Mr. Buch

represented that he would submit that memo and also attempt to get more

money for Ms. Musick. Ms. Musick again requested a written contract from

Mr. Buch for the work she had done. Buch again refused, saying that a

written contract between Lafayette and him already existed. Mr. Buch stated

he could not find the contract and so could not show it to Ms. Musick.

21.     In the beginning of September, the deadline was approaching to

submit the final translation. There had been no response from either the

Lafayette Police Department or Mr. Buch about payment. Ms. Musick still

had not been given a contract by Mr. Buch, the Lafayette Police Department

or the Attorney General's Office. Ms. Musick was still in direct contact with

Ms. Shearer of the Attorney General's Office advising her of the situation.
Ms. Musick informed Mr. Buch that she was going on vacation on
September 4, 2004 and she expected to be paid before leaving. Mr. Buch
specifically told her that he was working on it and that she would be paid
soon.

22.     On September 1, 2004, Ms. Musick spoke with Ms. Shearer of
the Attorney General's Office. Ms. Musick said that she had no confidence
that she would be compensated fairly for her translation, if at all, and that
she would not submit her portion of the translation until she received written
confirmation of payment from either Miguel Buch or the Lafayette Police
Department. Ms. Shearer agreed that the situation was a "mess" and that she
hoped that the payment issue could be resolved quickly. Ms. Shearer stated
that her deadline had passed and that she was receiving pressure from her
superiors to turn in the project. Ms. Shearer later urged Miguel Buch to take
out a loan in order to pay Ms. Musick and Ms. Santamaria and work out the
conflict with the Lafayette Police Department at a later time.

23.     Ms. Musick went to Mr. Buch regarding Ms. Sheer's
recommendation that a loan be taken out to pay the translators. Buch became
angry with Ms. Musick and called Sgt. McCausey. According to Mr. Buch,
Sgt. McCausey became furious as well during the conversation with Buch.

Buch stated that Sgt. McCausey was angry that Ms. Shearer had made the suggestion of a loan when it was Ms. Shearer who was causing the delay by not certifying the quality of the final translation so that payment could be made.

24.     Ms. Musick then suggested that Mr. Buch make a partial payment to her. She stated that she would leave her finished translation with Mr. Buch and go on vacation if he would pay her $2,000.00 [two thousand] and give her a written contract for the balance.  Buch refused to give her any money and demanded her completed work. Later in the day, Mr. Buch suggested that he, Buch, write a personal check to Ms. Musick that she could hold until the Lafayette Police Department paid her. Ms. Musick refused and then left on vacation. She did not turn over her translations before leaving on vacation.

25.     On September 14, 2004, Miguel Buch called Ms. Musick while she was on vacation and again requested that Ms. Musick turn in the translations. Musick again requested that she be paid the sum of $2,000.00 and be given a signed agreement to paid the balance. Buch then offered to give Musick a personal check to $2,000.00. Buch said he would negotiate with the Lafayette police department for the balance and that Ms. Musick

would tear up his personal check when the Lafayette Police authorized the full payment. Ms. Musick refused this offer.

26.     On September 15, 2004, Ms. Musick drafted a written contract reflecting her earlier verbal proposal to Mr. Buch that she be paid $2,000.00 with a written contract for the balance. On September 16, 2004, Ms. Musick faxed that document to Mr. Buch. Buch called back that same day and stated he was refusing to sign the contract and he would not guarantee anything in writing about when payment would be made. Ms. Musick reiterated that she had to have something in writing from him guaranteeing payment before she would hand over the translation. Buch told Musick he was going to cut her out of the project completely and that he would do her half of the translation himself. She would be paid nothing. Musick invited him to do so and hung up.

27.     On or about September 16, 2004, Mr. Buch informed Defendant McCausey that Ms. Musick was unwilling to turn over her Spanish translation without payment. In response, Defendant McCausey informed Buch that he, McCausey, would have Musick arrested for obstruction of justice because she was refusing to turn over her Spanish translation of the case file.

28.     On or about September 16, 2004, Musick received a call from Mr. Kevin Maddox, who was taking care of her animals and residence while she was on vacation. Mr. Maddox stated that he had been contacted by Mr. Buch who informed Maddox that a federal arrest warrant had been issued for Ms. Musick for obstruction of justice.

29.     On September 16, 2004 Ms. Musick called Miguel Buch at his office at 1777 6th Street, Boulder, Colorado. Ms. Musick said that she understood that there was a warrant out for her arrest. Mr. Buch corrected her and said it was Sgt. Gene McCausey of the Lafayette Police Department who had issued the warrant for her arrest. Ms. Musick said that she was in possession of the police file that had originally been given to her by Mr. Buch and would gladly turn it over to them. Ms. Musick stated she was under no obligation to turn over her Spanish translation without guarantee of payment. Miguel Buch stated that by law Ms. Musick was obligated to turn over her translation. Mr. Buch insisted that getting compensation for her work was a separate issue and no guarantee had to be given to her.

30.     Ms. Musick again refused to turn over her work product. In response, Mr. Buch stated that this was a very grave situation and that his job as well as her job could be on the line if she didn't turn over her translation immediately. Ms. Musick continued to refuse. In response, Buch

said, "Wait a minute. I have someone here that wants to talk to you. John Pickering." Ms. Musick knew Mr. Pickering from his work at the courthouse as the Chief Deputy District Attorney for the 20th Judicial District. Ms. Musick also knew that Mr. Pickering had played a central role as prosecutor in the Villalobos case that she, Musick, had translated. Ms. Musick waited while Buch put John Pickering on the speaker phone.

31.     Mr. Pickering started the conversation by stating that he was talking to Ms. Musick as a "friend". Pickering told Musick that she had to turn over the original police reports and her translations to them. Pickering stated that Musick was obstructing the process of a federal criminal investigation by holding back her translation work and that she had "…picked the wrong fight." Ms. Musick asked Pickering who had issued the arrest warrant for her. Pickering said that the warrant had been sent out by the Lafayette Police Department. In fact, no warrant had been issued. This lie was simply a ploy by Defendants Pickering and McCausey to intimidate Musick into turning over her translation.

32.     Ms. Musick reemphasized to John Pickering that she had absolutely no obligation to turn over her translation to anybody without guarantee of payment. Pickering responded by telling Musick that she "…really got the tiger by the tail…" by angering the Lafayette Police

Department and "…holding the project hostage." Chief Deputy District Attorney Pickering stated to Musick that she was breaking the law by not turning all of her work into them. Pickering informed Ms. Musick that she had made a bad business deal and if she attempted to sue Miguel Buch civilly she would lose. He warned her that this was a fight she did not want to begin, referring to further demands for payment. The Plaintiff asserts, on information and belief, that Defendant Pickering made this series of threats so that he, Pickering, could gain possession of the transcript without payment. Additionally, Pickering expressed legal opinions to Plaintiff Musick regarding the futility of any legal action in order to intimidate Musick from ever asserting her right to payment.

33.    At that point, Ms. Musick asked Pickering if Pickering was telling her that she would be arrested unless she turned her translation work over to them. Both Pickering and Buch told her that was her situation. Ms. Musick then responded that she would figure something out and would contact Buch later. Upon ending the phone call, Ms. Musick feared that she would be arrested and jailed on that day given the statements of Pickering and Buch as to McCausey's plans to arrest her.

34.    On that same day, Ms. Musick drove three hours back to her hotel, arriving at approximately 7 p.m. EST. She immediately called and left

a message for Ms. LuzMaria Shearer of the Attorney General's Office regarding making arrangement to deliver her translations to the Attorney General's Office. Ms. Musick left a message on Ms. Shearer's cell phone. Ms. Musick had called Ms. Shearer several times while on vacation to discuss the transcription/payment issue. Shortly after leaving the cell phone message, Ms. Musick received a return phone call from Ms. Shearer.

35.     Ms. Musick informed Ms. Shearer that she, Musick, had been informed by Pickering and Buch that Sgt. McCausey had issued an arrest warrant for her and she had been threatened with arrest if she did not turn over her Spanish translation. Shearer expressed concern that McCausey was using his authority inappropriately. Ms. Shearer stated that she had no knowledge that Sgt. McCausey had sought an arrest warrant for Musick. However, Shearer did recount that McCausey had mentioned to her at some point that he would get a search warrant for Musick's house to seize the translation if the project wasn't turned over to him.

36.     The following day Ms. Musick arranged for delivery of her translation and the English core documents to the office of the Colorado Attorney General in Denver, Colorado. The translation was turned over in CD format. An invoice dated September 17, 2004 for a total of $12,000.00 was also submitted to the Attorney General's Office and accompanied the

core documents and the translation. A copy of that invoice was sent to

Miguel Buch, John Pickering, and Colorado Attorney General Ken Salazar.

37.     Ms. Musick did not invoice the parties for the full amount of

her work because she thought it would be highly doubtful that they would

pay the full price of translation given that they had refused up to that point to

pay her anything. She discounted the bill in hopes of being paid something.

Ms. Music was ultimately paid $700. The actual time for doing the custom

formatting and translation demanded by the Attorney General's Office

resulted in a total cost of $16,020.00.

38.     On October 4, 2004, Sergeant Gene McCausey wrote a memo

to Miguel Buch claiming that the translation done by Ms. Musick was

incompetent. McCausey conceded that he had considered seeking the arrest

of Ms. Musick for obstruction of justice but McCausey claimed that he had

not communicated that fact to District Attorney Pickering. Plaintiff Musick

asserts, on information and belief, that Sergeant McCausey drafted this

memo in an attempt to avoid payment for the work done by Ms. Musick and

to shift culpability from himself for having issued the threat to Interpreter

Buch that he would have Ms. Musick arrested if she did not turn over her

translation. Those actions by Defendant McCausey were done to retain

Plaintiff's work product without due process of law.

39.     Plaintiff asserts, on information and belief, that Defendant McCausey issued a threat of arrest to Buch to obtain Plaintiff Musick's transcript. Defendant McCausey told Buch on September 16, 2004 that he would have Musick arrested if she did not turn over her translation. Plaintiff asserts on information and belief, that Defendant McCausey knew that the threat would be passed on to Musick by Buch.  Defendant Pickering repeated the threat from Defendant McCausey, in his position as a lawyer and the prosecutor in the case, in order to force Musick to surrender her work without payment. Defendant Pickering issued the threat to Musick after she repeatedly refused to turn over her work product without payment. Defendants McCausey and Pickering knew that their conduct in securing the translation by threats and intimidation under color of law clearly violated established law.

40.     Additionally, Ms. Schearer reported to Plaintiff Musick that Defendant McCausey had discussed with her using a search warrant to access Musick's house to secure the Spanish translation. That is further evidence that Defendant McCausey contemplated illegal means to gain the transcript for which he had not paid and openly discussed options for seizing the translation with others. Ms. Musick immediately turned over her translations because she was in fear of imminent arrest. Ms. Musick

experienced significant emotional trauma both while acting under the threat of arrest and after she turned over her work product to the Attorney General's Office. Ms. Musick suffered feelings of degradation, fear, anxiety and humiliation for allowing Defendants Pickering and McCausy to successfully intimidate and manipulate her.

41.     Ms. Musick's work product was ultimately utilized by the Attorney General's Office, the District Attorney's Office for the 20th Judicial District, and the Lafayette Police Department in seeking the prosecution of Mr. Villalobos in Mexico.

## D. CLAIMS FOR RELIEF

### (42 USC Section 1983 claims)

42.     The actions of defendants Pickering and McCausey in gaining the plaintiff's work product through deception, intimidation, and threats acting under color of state law constituted the unreasonable seizure of her property in violation of the 4th and 14th Amendments to the Federal Constitution.

43.     The actions of defendants Pickering and McCausey in retaining

the property of Plaintiff Musick acting under color of state law without due

process of law constituted a violation of Plaintiff Musick's due process

rights under the 4th and 14th Amendments to the Federal Constitution.

**(Quantum Meruit claim)**

44.     The actions of defendants Colorado Attorney General's Office,

District Attorney's Office for the 20th Judicial District, and the Lafayette

Police Department in gaining the plaintiff's work product at plaintiff's

expense, and receiving the benefit of that work product, under circumstances

that make it unjust for the defendants to retain the benefit of that work

without paying, have unjustly enriched those defendants under the contract

theory of quantum meruit.

**E. RELIEF REQUESTED**

WHEREFORE, Plaintiff seeks as relief the following:

45.     Compensatory damages in an amount yet to be determined,

attorney fees, costs, expert witness fees, pre-judgment interest, post-

judgment interest, and punitive damages jointly and severally as to

Defendants Pickering and McCausey;

46.   Disgorgement of unjust enrichment:

    a.  Jointly and severally as to Defendants Attorney General's

       Office for State of Colorado, District Attorney's Office for

       the 20th Judicial District, and the Police Department for the

       City of Lafayette, State of Colorado.

    b.  Attorney fees, costs, expert witness fees, pre-judgment

       interest, post-judgment interest, jointly and severally as to

       Defendants Attorney General's Office for State of

       Colorado, District Attorney's Office for the 20th Judicial

       District, and the Police Department for the City of

       Lafayette, State of Colorado.

## F. JURY DEMAND

47.   The Plaintiff demands a trial by jury as to all issues so triable pursuant

to Rule 38(c) of the Federal Rules of Civil Procedure.

DATED July 20, 2005

Respectfully Submitted,


s/Mark C. Johnson
Mark C. Johnson
4450 Arapahoe Ave., Suite 100
Boulder, CO 80303
Telephone: (303) 448-8836
Facsimile: (303) 415-2500
**MarkJohnson297@hotmail.com**